IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MEDICAL MUTUAL INSURANCE COMPANY OF NORTH CAROLINA, <br><br> *Plaintiff*, <br><br> v. <br><br> JONI J. JOHNSON, M.D., *et al.*, <br><br> *Defendants*. | Case No. 1:19-cv-1601 <br> Hon. Liam O'Grady |

### MEMORANDUM OPINION & ORDER

Before the Court is Defendants' motion to dismiss or stay Plaintiff's First Amended Complaint ("FAC"). *See* Dkts. 32; *see also* Dkt. 44. For the reasons set forth below, Defendants' motion is **DENIED**.

### I. BACKGROUND

Plaintiff Medical Mutual Insurance Company of North Carolina ("MMIC") brings this action under 28 U.S.C. § 2201, seeking a declaration from the Court that it owes no duty to defend or indemnify a medical practitioner ("Joni Johnson" or "Johnson") and her practice ("Pediatric Partners for Attention and Learning, Inc." or "PP4AL") against four lawsuits filed against them in the Circuit Court for Stafford County. The Plaintiffs suing Johnson and PP4AL in Virginia state court are Defendants in this case.[1] Defendants urge the Court to abstain from issuing a declaratory judgment, arguing that it would risk interference with the underlying state court proceedings.

---

[1] Johnson and PP4AL are also Defendants in this action.

To accord due respect to the balance of state and federal interests in these matters, the Court must carefully review the factual and legal issues raised in the underlying state court proceedings, before analyzing whether these issues are "intertwined" or implicated by the declaratory relief Plaintiff seeks. *See Zurich Am. Ins. Co. v. Pub. Storage*, 697 F. Supp. 2d 640, 642 (E.D. Va. 2010) (Ellis, J.) ("Distilled to its essence, the question presented . . . is whether deference to the previously filed state action is warranted because adjudication of the merits of this declaratory judgment suit could create an unnecessary entanglement with the ongoing state court proceedings."). Thus, the Court begins at the beginning, looking at the facts giving rise to the underlying state court proceedings.

### 1. The founding of Pediatric Partners for Attention and Learning, Inc

Dr. Joni Johnson founded PP4AL as "a multidisciplinary clinic offering comprehensive medical, behavioral health, and cognitive/educational services to children" in 2012. Dkt. 28, at 31, ¶ 119. Johnson allegedly owned PP4AL at all relevant times. Dkt. 28-3, at 9, ¶ 26.

### 2. The hiring of Sharonda Avery

In November 2012, PP4AL and Johnson hired Sharonda Avery ("Avery") as a part-time in-house educational advocate. Dkt. 28, at 31, ¶ 120. When Avery was hired, she boasted of extensive educational credentials: "a Doctorate of Philosophy in General Psychology from Grand Canyon University, a Doctorate in Psychology in Clinical Psychology from Virginia Commonwealth University, a Masters of Education in the field of Special Education, and Cross-Categorical from Grand Canyon University." *Id.* at 12, ¶ 50. In reality, "Avery possessed no college degrees." *Id.* at 14, ¶ 56.

### 3. The promotion of Sharonda Avery

Avery's lack of bona fide qualifications did not deter her meteoric rise through PP4AL's ranks. In May 2013, she was offered full time employment at PP4AL and given responsibility for "educational advocacy, tutoring, and other educational functions." *Id.* at 31, ¶ 120. Then, in 2014, Johnson decided to promote Avery to the role of "Director of Cognition and Instruction" at PP4AL. *Id.* ¶ 121. Before Avery's promotion was finalized, Johnson asked her to "provide confirmation of her educational degrees and proof of appropriate licensure." *Id.* at 32, ¶ 122. Avery provided Johnson with falsified PhD diplomas, *id.* at ¶ 123, and "advised Johnson that because of [Avery's] autism, [she] was exempted from the standard Board of Psychology licensing requirements and instead had been granted a three-year provisional license to practice as a psychologist in Virginia," *id.* ¶ 122. Johnson bought this cockamamie story and did not ask Avery to provide "documentation of her 'provisional license' to practice as a psychologist in Virginia." *Id.* at ¶ 123. Nor did Johnson second guess her decision to promote Avery after discovering that a complaint had been lodged against Avery by the Spotsylvania County School Division with the Virginia Department of Health Professions for Avery's unlicensed practice of psychology. *Id.* at ¶ 124. Johnson did ask Avery about the complaint, but Avery "advised [her] that the matter had been closed as undetermined, subject to be being reopened if additional complaints were received." *Id.* That was the extent of Johnson's due diligence, and she promoted Avery to Director of Cognition and Instruction in July 2014 at PP4AL.

As Director of Cognition and Instruction, Avery served as "a fulltime health service provider," administering tests, making diagnoses, providing counseling and therapy, and recommending medications for patients that were ultimately "signed off on by Johnson and other physician employees of PP4AL." *See id.* at 31–32, ¶ 121; *id.* at 17, ¶ 73. During this time,

3

PP4AL held Avery out to the public as a "licensed psychologist authorized to practice in Virginia." *Id.* at 12, ¶ 50.

### 4. Avery's licensure status and her declining performance

In January 2017, "Johnson asked Avery about the status of her licensure to practice psychology in Virginia." *Id.* at 32, ¶ 125. When Avery told Johnson that she did not believe she would be able to obtain permanent licensure in Virginia, Johnson "urged Avery to seek licensure in the District of Columbia" instead. *Id.* To no surprise, Avery replied that "did not think she could obtain permanent licensure from the District" either. *Id.* at 32, ¶ 126. Remarkably, Johnson did not immediately terminate Avery following this exchange.

"In or around March 2017," Johnson started to notice "that Avery became distant and disengaged from the practice and her patients and was also late to appointments and frequently rescheduled them." *Id.* at 33, ¶ 127. "Avery also became increasingly unreliable and regularly failed to provide dates and times to see patients." *Id.*

### 5. Johnson and PP4AL's medical professional liability policy

In June 2017, Johnson applied for a "Medical Professional Liability Policy, Policy No. PS119567" (the "Policy") with Plaintiff Medical Mutual Insurance Company of North Carolina ("MMIC") to insure her and her practice. *See id.* at 33–40, ¶¶ 129–132. MMIC issued this policy, which covered the period "from September 1, 2017 to September 1, 2018," and was subsequently "renewed . . . for the policy period from September 1, 2018 to September 1, 2019." *Id.* at 33, ¶ 129.

The Policy contains many relevant limitations that bear on MMIC's duty to defend and indemnify Johnson and PP4AL in the underlying state court proceedings, including the following salient provisions:

4

. . .
**IV. Insured's Duties:** In addition to all the conditions and other responsibilities described throughout this policy, the Insured [i.e., Johnson and PP4AL] has all of the following duties:

. . .

(h) To notify [MMIC] as soon as practicable and in writing, of material changes in the Medical Practice, including, but not limited to . . . the addition or deletion of any physician or Advanced Practice Provider to or from the Medical Practice

. . .

**XI. Definitions:** The following definitions shall apply[:]

. . .

(a) "Advanced Practice Provider" means . . . psychotherapists [and] licensed clinical social workers . . .

. . .

**XII. Policy Conditions:** The following conditions apply to this policy:

. . .

(h) Insured's Representations[:] By acceptance of this policy, each Insured agrees that the statements in the respective applications, renewal questionnaires, and any other documents submitted to the Company are true and correct. In addition, it is understood and agreed that those statements are incorporated into and shall form a part of this policy. [MMIC] reserves the right to rescind this policy or any coverage provided hereby, for any material misrepresentations made by an insured.

*See* Dkt. 28-5. In applying for the Policy on June 19, 2017, Johnson made the following representations:

- [Johnson:] I certify that I have no knowledge of any occurrence, incident[,] or circumstance likely to result in such a claim as of this date . . .
- [Johnson:] I understand that an incorrect or incomplete response could cause the denial of a claim or the cancellation of my protection if coverage is written as a result of this application

\* \* \*

- [MMIC:] Do you employ or contract with any non-physician . . . personnel?
- [Johnson:] Yes
- [MMIC:] Provide the number of non-physician personnel:
- [Johnson:] Psychotherapists: 0
- [Johnson:] Other: 2
- [MMIC:] Please specify:
- [Johnson:] Licensed Professional Counselors

\* \* \*

- [Johnson:] I certify the representations in this application to be true and understand that the policy if issued, is conditioned upon the truth of the representations in this application. I further understand that the falsity of any representations made in this

5

      application for insurance could cause the denial of a claim or the cancellation of my protection if coverage is written as a result of this application.

Dkt. 28, at 39–41, ¶¶ 132–133.

### 6. Avery's termination from PP4AL and downfall

In August 2017, Johnson "removed Avery completely from the schedule for patient treatment." *Id.* at 33, ¶ 128. Avery remained employed at PP4AL for an additional two months, until she was terminated on October 10, 2017, after the Policy took effect. *Id.* Following Avery's termination, "Johnson and PP4AL never notified" patients that she was not licensed and was treating them as an unlicensed and unqualified lay person. *Id.* at 18, ¶ 76.

Right around the time when Avery was fired from PP4AL, she was hired by her former "patient," Vernon Green Jr., as the "Executive Director" of Green's non-profit youth development organization, G3 Community Services ("G3"), to oversee G3's day-to-day operations, business development, and outreach to Stafford County schools. *Id.* at 13, ¶ 54. As Executive Director of G3, "Avery was issued a debit card for G3's bank accounts." *Id.* ¶ 54. In early 2018, Green and G3 staff noticed unaccounted expenditures associated with the G3 debit card. *Id.* at 14, ¶ 55. G3 asked for Avery to account for her expenditures and to provide "documentation of her degree in and license to practice psychology." *Id.* Avery did not comply and was terminated by G3 in March 2018. *Id.* G3 then discovered that Avery had misappropriated more than $13,000 of G3's corporate funds for personal purchases. *Id.* ¶ 56.

The jig was up. G3 alerted the Stafford County Sheriff's office, and Avery was arrested on May 6, 2019. *Id.* at 18, ¶ 77. She entered an *Alford* plea to charges of obtaining money by false pretenses, forgery, uttering, perjury, and the practice of psychology without a license. Dkt. 28-8, at 11, ¶ 37.

### 7. Lawsuits brought against Johnson and PP4AL in Virginia state court

PP4AL closed permanently in January 2019. Dkt. 28, at 28, ¶ 108. Still, PP4AL's former patients, dismayed to discover that they had paid for and received amateur medical treatment from a charlatan, sought legal redress. Forty former patients filed four separate lawsuits against Johnson, PP4AL and several other Defendants in the Circuit Court for Stafford County, Virginia in 2019 and 2020. *See generally* Dkts. 28-1, 28-2; 28-3; 28-4. The Court will refer to these lawsuits as the Green Lawsuit, the Gnik Lawsuit, the Gause Lawsuit, and the Lovitt Lawsuit, respectively. *See* Dkt. 28, at 12. These suits raise distinct combinations of claims. None has yet proceeded to final judgment.

### a. The Green Lawsuit

The Green Lawsuit (Dkt 28-1) alleges, *inter alia*, the following against Johnson and PP4AL:

- **Count II:** "Gross Negligence" based on the failure of Johnson and PP4AL to "take the simple untroublesome step of ensuring proper certification of a medical health care provider" in violation of their professional duties. Dkt. 28-1, at 15, ¶¶ 77, 79..
- **Count V:** "Negligent Hiring" based on Johnson and PP4AL's hiring of Avery, even though they "knew or should have known" that she was not a licensed psychologist holding the appropriate credentials to practice psychology. *Id.* at 18, ¶ 105. To show damages in connection with this claim, the Plaintiff alleges that he "was deprived of the opportunity to receive competent treatment." *Id.* at 19, ¶ 110.
- **Count VI:** "Constructive Fraud" based on Johnson and PP4AL's "negligent" or "innocent" misrepresentation of Avery's qualifications. *Id.* at 20, ¶¶ 116–17.
- **Count VIII:** "Common Law Conspiracy" based on Johnson and PP4AL's undertaking of a "concerted effort to deprive Mr. Green of licensed, credentialed, and competent healthcare services and treatment in furtherance of their conspiracy to enrich themselves." *Id.* at 22, ¶ 138.

### b. The Gnik Lawsuit and the Lovitt Lawsuit

The Gnik Lawsuit and the Lovitt Lawsuit were "brought by the same plaintiff's attorney and, essentially, assert the same factual allegations." Dkt. 28, at 16, ¶ 66. These lawsuits (Dkts. 28-2, 28-3) allege, *inter alia*, the following against Johnson and PP4AL:

7

- **Count 1:** "Negligent, Grossly Negligent, and Reckless Breach of Duty Arising from Special Relationship" based on Johnson and PP4AL's knowledge or constructive knowledge that Avery, an amateur, posed a danger to Plaintiffs and their families by virtue of her role as a provider of medical, psychological, and other non-medical services to Plaintiffs. Dkt. 28-2, at 78, ¶ 486. Supporting this claim, Plaintiffs allege Avery's "poor performance" leading up to her firing in September 2017. *Id.* at 14, ¶ 65.

- **Count II:** "Negligent, Grossly Negligent, and Reckless Hiring, Retention, and Supervision" based on Johnson and PP4AL's failure to "create and otherwise maintain adequate and sufficient procedures and steps to investigate the backgrounds of persons whom they hired." *Id.* at 80, ¶ 507. In support of this Count, Plaintiffs allege that Johnson and PP4AL "failed to conduct a proper investigation of the various complaints about Ms. Avery by parents [of her patients], [and] failed to conduct a proper investigation and/or oversight of the clinical care being provided by Ms. Avery." *Id.* at 81, ¶ 502. They also allege that Johnson and PP4AL had "actual knowledge that [Avery] was not fit and should not have been retained as an employee." *Id.* at 83, ¶ 512.

- **Count III:** "Civil Conspiracy" based on Johnson and PP4AL's "false belief that Ms. Avery was a licensed psychologist" from 2012 to 2018. *Id.* at 84, ¶ 517. Plaintiffs allege that "[w]hen questions from patients and their families arose regarding the competency, qualifications, and/or credentials of Ms. Avery, Dr. Johnson [and PP4AL] made false statements that Ms. Avery was a licensed psychologist in the Commonwealth of Virginia in a concerted effort to protect themselves and avoid civil and criminal penalties." *Id.* ¶ 518.

- **Count IV:** "Constructive Fraud" based, in part, on Johnson and PP4AL's representations of Avery's qualifications, which precluded Plaintiffs from "receiv[ing] proper and necessary treatment for their medical conditions." *Id.* at 94, ¶ 562. In support of this claim, Plaintiffs imply that Johnson and PP4AL were aware that Avery was not licensed at the time of her firing. *See id.* at 14, ¶ 66 ("At no time, *before* or after Ms. Avery's firing, did Dr. Johnson or PP4AL notify patients that they were treated by an unlicensed and unqualified psychologist.") (emphasis added).

   c. **The Gause Lawsuit**

The Gause Lawsuit (Dkt 28-4) alleges, *inter alia*, the following against Johnson and/or PP4AL:

- **Count III:** "Vicarious Liability" based on Avery's misrepresentations made within the scope of her employment with PP4AL. Dkt 28-4, at 13, ¶ 57.

- **Count IV:** "Negligent Hiring and Retention" based on Johnson and PP4AL's reckless failure to vet Avery's qualifications and breach of duty to ensure that Avery was performing her job responsibly. *Id.* at 14, ¶¶ 64, 66–67, 69.

- **Count V:** "Violation of the Virginia Consumer Protection Act" based on the costs incurred by Plaintiffs due to the "willful misrepresentations" of "all of the Defendants." *Id.* at 16, ¶ 79.
- **Count VI:** "Fraud in the Inducement" based on the Plaintiffs' reliance on the "willful" and "wanton" material misrepresentations made by PP4AL and Johnson that Avery was a licensed medical professional. *Id.* at 17, ¶¶ 84–86.

### 8. Procedural History in this action

On December 20, 2019, in response to the four complaints filed in the Circuit Court for Stafford County against Johnson and PP4AL, MMIC filed a complaint in this Court seeking a declaration that it is not obligated under the Policy to defend or indemnify Johnson or PP4AL in the underlying lawsuits. In MMIC's First Amended Complaint ("FAC"), filed August 4, 2020, it asks the Court to render four declarations:

- **Count 1:** Declaration that MMIC has no duty to defend or indemnify Johnson or PP4AL in the underlying lawsuits due to materially false statements on the policy applications. Dkt. 28, at 42–43.
- **Count 2:** Declaration that MMIC Has No Duty to Defend or Indemnify Johnson or PP4AL in the Underlying Lawsuits Where the Claims Stated Are Precluded from Coverage Under Multiple Policy Exclusions. *Id.* at 44–46.
- **Count 3:** Declaration that MMIC Has No Duty to Defend or Indemnify Johnson or PP4AL in the Underlying Lawsuits Where the Claims are Considered One Related Claim Deemed Made Prior to the Effective Date of the Policy. *Id.* at 47
- **Count 4:** Declaration that MMIC Has No Duty to Defend or Indemnify Johnson or PP4AL in the Underlying Lawsuits Where the Claims are Related to and Interdependent upon Excluded Conduct of Avery. *Id.* at 48.

Defendants filed a motion to dismiss or stay Plaintiff's request for declaratory relief on August 25, 2020. *See* Dkt. 32. The Court has diversity jurisdiction over this Declaratory Judgment action pursuant to 28 U.S.C. §§ 1332, 2201.

## II.   LEGAL STANDARD

The Declaratory Judgment Act provides that, "in a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

9

of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court has characterized the Declaratory Judgment Act as "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 241 (1952). Thus, "district courts have great latitude in determining whether to assert jurisdiction over declaratory judgment actions." *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998); *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996); *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937). Federal standards "guide the inquiry as to the propriety of declaratory relief in federal courts, even when the case is under the court's diversity jurisdiction." *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir. 1990).

### III.   DISCUSSION

A district court may exercise discretion to yield its power to hear a declaratory judgment action when a connected, parallel proceeding is ongoing in state court. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 289–90 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942); *see also Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) ("[F]ederal courts may decline to exercise their jurisdiction, in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest.") (quotation marks omitted).

However, this discretion is not boundless; the Court must give effect to Congress's intent embodied in the Declaratory Judgment Act of 1934. *See Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 462 (4th Cir. 2005) (citing *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)) ("Federal courts 'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not.'"). The Court may not decline to entertain a Declaratory

Judgment Act action "as a matter of whim or personal disinclination." *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962).

The Fourth Circuit eloquently speaks to this delicate balance:

> [T]he discretion [of a district court] to grant or refuse the declaratory relief . . . should be liberally exercised to effectuate the purposes of the statute and thereby afford relief from uncertainty and insecurity with respect to rights, status and other legal relations[;] but it should not be exercised for the purpose of trying issues involved in cases already pending, especially where they can be tried with equal facility in such cases, or for the purpose of anticipating the trial of an issue in a court of co-ordinate jurisdiction. The object of the statute is to afford a new form of relief where needed, not to furnish a new choice of tribunals or to draw into the federal courts the adjudication of causes properly cognizable by courts of the states.

*Quarles*, 92 F.2d at 324.

Consistent with *Quarles*, the Fourth Circuit, in *Nautilus Insurance Co. v. Winchester Homes, Inc.*, outlines several factors that guide a district court's abstention when federal declaratory relief is sought in parallel with an ongoing state court proceeding. *See* 15 F.3d 371, 376–77 (4th Cir. 1994). *Zurich American Insurance Company v. Public Storage*, a recent decision from this District, retells the Fourth Circuit's decision in *Nautilus* and elucidates its bearing on this case:

> In *Nautilus*[,] some four months after a product liability action was filed against the insured in Maryland court, Nautilus, the insurer, filed a federal court action requesting a declaration (i) that the insurance policy in issue was void due to material misrepresentations and omissions in the application for coverage, and (ii) that the claims in the state court action were, in any event, outside the scope of the policy's coverage. After seven months of "extensive" discovery in the federal declaratory action and only one week before trial, the district judge granted a motion to dismiss the action in light of the pending state court action. On appeal, the Fourth Circuit held that district courts considering whether to stay a declaratory judgment action should consider four factors: (i) whether the state has a strong interest in having the issues decided in its courts; (ii) whether the state courts could resolve the issues more efficiently than the federal courts; (iii) whether the presence of "overlapping issues of fact or law" might create unnecessary "entanglement" between the state and federal courts; and (iv) whether the federal action is mere "procedural fencing." Applying these factors, the *Nautilus* panel reversed the district court's dismissal of the action, finding that on the facts of that case, "considerations of federalism, efficiency, and comity are not sufficiently compelling to

11

overcome the strong federal interest in awarding declaratory relief that will serve the salutary purposes of the Declaratory Judgment Act."

697 F. Supp. 2d at 644 (citing *Nautilus*, 15 F.3d at 376–77). The four factors outlined in *Nautilus* are well recognized by the Fourth Circuit. *See, e.g., Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 355 Fed. App'x 698, 700 (4th Cir. 2009) (applying *Nautilus* in declaratory suit over duty to defend in Florida court under policy governed by Virginia law); *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 413–14 (4th Cir. 2004) (applying *Nautilus* in declaratory suit over duties to defend and indemnify in Virginia court under policy governed by Virginia law). As the Fourth Circuit explains in *United Capitol Ins. v. Kapiloff*, the four *Nautilus* factors often disfavor abstention in declaratory judgment actions brought by insurance companies in response to underlying state court proceedings:

> A declaratory judgment action . . . undoubtedly serve[s] a useful purpose in settling the disputed rights of [parties] under [an] insurance policy, [resolving] the uncertainty of whether coverage exists under the policy. It is well established that a declaration of parties' rights under an insurance policy is an appropriate use of the declaratory judgment mechanism. The declaratory judgment action is designed to allay exactly the sort of uncertainty that flows from the threat that ambiguous contractual rights may be asserted. The declaratory judgment action allows the uncertain party to gain relief from the insecurity caused by a potential suit waiting in the wings.

155 F.3d 488, 494 (4th Cir. 1998).

Against this backdrop, the Court turns to an application of the *Nautilus* factors to the facts of this case.

The first *Nautilus* factor looks to the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts. This factor accounts for *Erie*'s axiomatic principle that state courts are "the most authoritative voice" to speak on the meaning of state law. In this case, none of MMIC's claims are novel or legally complex. They involve "relatively straightforward" issues of insurance contract interpretation. *See Lloyd v. Travelers*

*Prop. Cas. Ins. Co.*, 699 F. Supp. 2d 812, 817 (E.D. Va. 2010). Accordingly, the state's "authoritative voice" is simply not needed to lend additional clarity to the legal questions before the Court. *Penn-America*, 368 F.3d at 414 (citing *Kapiloff*, 155 F.3d at 494) ("[T]he State's interest is not particularly significant where any state law issues are standard and unlikely to break new ground.") (internal quotation marks omitted).

The second *Nautilus* factor, which focuses on whether the state court can resolve the issues more efficiently, also does not favor abstention. The Court does not dispute that state courts are well-situated to expeditiously resolve "all litigation stemming from a single controversy in a single court system." *Fid. & Guar. Ins. Underwriters, Inc. v. Holt*, 2 F. Supp. 2d 798, 801 (E.D. Va. 1998). But MMIC's complaint raises several "issues and facts" that are not raised in the four underlying state court proceedings.[2] *Contra* Dkt. 33, at 6 (citing *Nationwide Property & Casualty Insurance C. v. Fraraccio*, 250 F. Sup. 3d 5 (E.D. Va. 2017)). MMIC is not a party to these state court proceedings, and so insurance coverage issues are unlikely to arise. In fact, there exists some doubt as to whether MMIC can join in the underlying state court actions to protect its interests. *See Penn-America*, 368 F.3d at 414 ("[I]t is not clear under Virginia rules that [the insurer] could intervene to have coverage issues decided within the scope of the underlying tort case"); *Zurich*, 697 F. Supp. 2d at 645 ("[A] state court would only decide the matter in some as-yet-unfiled action or if [the Plaintiff-insurer] chose to intervene in the underlying action, to the extent intervention would be permitted under Virginia procedural rules."); *Lark v. Nationwide Ins. Co.*, 2013 WL 5918310, at *4 (W.D. Va. Oct. 31, 2013) ("[The insurer] is not, and cannot be made, a party to the pending state tort suit. Under Virginia law, 'an injured person must reduce his claim to judgment before bringing an action against the

---

[2] See the discussion of the third *Nautilus* factor for a more thorough analysis of this issue.

13

tortfeasor's liability insurer.'"). With all this in mind, the Court finds that no efficiency gains are to be had by abstaining. *See Penn-America*, 368 F.3d at 414; *Zurich*, 697 F. Supp. 2d at 645.

As for the third *Nautilus* factor, upon careful review, the Court concludes that at least one of MMIC's requests for declaratory relief (Count 1) presents no "overlapping issues of fact or law" that will create unnecessary "entanglement" between the state and federal courts. *Nautilus*, 15 F.3d at 379–80.[3]

In Count 1, MMIC seeks a declaration that it "has no duty to defend or indemnify Johnson or PP4AL in the underlying lawsuits due to materially false statements on the policy applications." Dkt. 28, at 42. Section XII of the Policy, to which Johnson assented in 2017, unequivocally conditions the Policy's validity on the truth of the statements made by Johnson when she applied for the Policy:

> By acceptance of this policy, each Insured agrees that the statements in the respective applications, renewal questionnaires, and any other documents submitted to the Company *are true and correct*. In addition, it is understood and agreed that *those statements are incorporated into and shall form a part of this policy. The Company reserves the right to rescind this policy or any coverage provided hereby, for any material misrepresentations made by an insured.*

*See* Dkt. 28-5, at 18 (emphasis added). Johnson certified her understanding of this provision and represented that her application statements were true. *See* Dkt. 28, at 40, ¶ 132. Accordingly, whether MMIC now has a duty to defend and indemnify Johnson and PP4AL turns not on Johnson's mental state at the time she applied for the Policy, but instead on the actual truth of the representations she made in connection with her Policy application. Put differently, Johnson's knowledge of Avery's malfeasance as of June 2017 is not relevant to whether the Policy was

---

[3] *See also Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 205 (4th Cir. 2006) (reversing a district court, in part, for its incorrect determination that "the issues necessary to resolve [the insurer's] claims would necessarily be resolved in the Underlying Actions")

valid during the relevant period; all that matters is whether Johnson's statements were objectively true when made.

To that end, Johnson represented to MMIC that zero "Psychotherapists" and two "Licensed Professional Counselors" worked at PP4AL. *Id.* at 39–41, ¶ 132. Whether these representations were true when made may be ascertained without interfering, precluding, entangling, or preempting the underlying state court actions. This narrow inquiry would not necessarily create "issues of estoppel regarding the factual findings of the State Court. *See* Dkt. 33, at 3. The reason is simple: either Johnson (1) improperly reported Avery as a "Licensed Professional Counselor" on the application, (2) erroneously omitted Avery as a "Psychotherapist" on the application, or (3) did not include Avery in either tally because Johnson knew Avery was unlicensed. In either case, an inquiry into whether Johnson voided her Policy on these bases would have no bearing on the cases pending in the Circuit Court for Stafford County.

The same principle applies to Johnson's agreement, as a condition of the Policy's ongoing validity, to notify MMIC "as soon as practicable and in writing, of . . . the addition or deletion of any [psychotherapist or licensed clinical social worker] to or from the Medical Practice." Dkt. 28-5, at 9; *see also id.* at 15 (defining an "Advanced Practice Provider" as, *inter alia*, a "psychotherapist" and a "licensed clinical social worker"). MMIC alleges that it never received a notice from Johnson pertaining to Avery. All that is left to determine, then, is whether Avery was a "psychotherapist" under the meaning of the Policy's language.[4] This inquiry also does not implicate the underlying state court cases.

---

[4] "Deletion" of Avery from the practice would not trigger the duty of Johnson and PP4AL to notify MMIC that a "licensed clinical social worker" had been terminated. That is because Avery, in fact, had no license. Avery's status as a lay person masquerading as a licensed psychologist also calls into question whether she qualifies as a "psychotherapist" for purposes of Section IV of the Policy. *See* Dkt. 28-6, at 9.

The same is not true for the other declaratory relief that MMIC seeks. Granting MMIC's request relief in Counts II, III, and IV would require the Court to consider "overlapping issues of fact or law," with the potential to create unnecessary "entanglement" between the state and federal courts. *Nautilus*, 15 F.3d at 379–80.

In Count II, for example, MMIC asks the Court to decide whether Johnson and PP4AL "knew or should have known of a Medical Incident that by its nature may result in a Claim" by September 1, 2017. This request overlaps with the factual and legal issues inherent in Count II of the Lovitt Complaint ("Negligent, Grossly Negligent, and Reckless Hiring, Retention, and Supervision") and Count IV of the Gause Complaint ("Negligent Hiring and Retention"). *See* Dkt. 28-3, at 19, ¶ 84 ("Defendants also failed to conduct a proper investigation of the various complaints about Ms. Avery . . . as well as failed to conduct a proper investigation and/or oversight of the clinical care being provided by Ms. Avery"); Dkt. 28-4, at 14, ¶ 66 ("PP4AL and Dr. Johnson also had the responsibility and duty to their patients to make sure that [their employees] were . . . performing their jobs responsibly. PP4AL failed to do so . . . .").

In Count III, MMIC asks the Court to determine whether "Johnson had knowledge of a Medical Incident prior to the effective date of the Policy[.]" To comply, the Court would need to inquire into the timing and existence of Johnson's awareness of Avery's licensure status and poor job performance. This inquiry bears generally on the damages available to the Plaintiffs in the underlying state court cases, and specifically on Counts II and III of the Gnik Lawsuit, which allege that Johnson and PP4AL had "actual knowledge" that Avery was not fit and should not have been retained as an employee" prior to her termination. Dkt. 28-2, at 83, ¶ 512; *see also id.* at 84, ¶ 518 (alleging that Johnson and PP4AL engaged in a "concerted effort to protect themselves and avoid civil and criminal penalties").

Finally, in Count IV, MMIC asks the Court to declare that "Avery's alleged conduct falls within multiple [Policy] exclusions" because "the claims against Johnson and PP4AL are related to and interdependent upon [Avery's conduct]." Count IV urges the Court to attribute Avery's malfeasance to Johnson and PP4AL based on agency principles. This overlaps with the legal theory advanced in Count III of the Gause Lawsuit ("Vicarious Liability"), which seeks redress based on Avery's misrepresentations made within the scope of her employment with PP4AL. Dkt. 28-4, at 13, ¶ 57.

In sum, the Court finds that Count I of Plaintiff's request for declaratory relief does not cause unnecessary entanglement of the state and federal court systems, and so the third *Nautilus* factor does not favor abstention. By contrast, the Court finds that the Counts II, III, and IV seek a declaration that seriously risks upsetting state-federal comity.

Finally, the fourth *Nautilus* factor, which asks whether MMIC's federal action is a product of forum-shopping, does not favor abstention. *Nautilus*, 15 F.3d at 377. There is scant evidence of "procedural fencing." *Penn-America*, 368 F.3d at 412. MMIC "filed this action to resolve questions that are traditionally resolved in declaratory judgment actions, and it did so under standard diversity jurisdiction." *Kapiloff*, 155 F.3d at 494. Moreover, as explained above, there is some doubt as to whether MMIC is capable of joining the underlying state court actions. That leaves this District as the *only* avenue for relief available to MMIC.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss (Dkts. 32) Plaintiff's Declaratory Judgment action (Dkt. 28) is **DENIED** as to Count 1 of the FAC. *See id.* at 42–43. The Court **HOLDS IN ABEYANCE** the remaining Counts in Plaintiff's FAC, *id.* at 44–49,

given the palpable risks they present for unnecessary entanglement with the four underlying Virginia state court cases brought against Defendants Johnson and PP4AL.

It is **SO ORDERED.**

November 24, 2020
Alexandria, Virginia

_____
Liam O'Grady
United States District Judge