**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| **MEDICAL MUTUAL INSURANCE** ) | |
| **COMPANY OF NORTH CAROLINA,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.:** 1:19-cv-01601-LO-TCB |
| ) | |
| **JONI J. JOHNSON, M.D., et al.** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM IN SUPPORT OF MEDICAL MUTUAL INSURANCE COMPANY OF
NORTH CAROLINA'S MOTION OF FOR SUMMARY JUDGMENT AS TO COUNT I
OF THE SECOND AMENDED COMPLAINT.**

Plaintiff Medical Mutual Insurance Company of North Carolina ("MMICNC"), by

counsel, for its Memorandum in Support of its Motion for Summary Judgment as to Count I of

the Second Amended Complaint, states as follows:[1]

## I.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Civil Rule 56(B) MMICNC sets for the following Statement of

Material Facts Not in Dispute ("SMF").

1.     Sharonda Avery ("Avery") was hired by Pediatric Partners for Attention and

Learning ("PP4AL") in November 2012 as an educational advocate. See August 19, 2021

Deposition of Joni J. Johnson ("Johnson Dep."), p. 15, lines 15-19, 20-22. [2]

2.     In July 2014, PP4AL retained Avery as Director of Cognition and Instruction.

She performed services as a psychologist, including administering testing to patients and

engaging in counseling and therapy services. Avery also supervised all PP4AL staff who were

---

[1]     All counts of the Second Amended Complaint apart from Count I have been ordered held
in abeyance by the Court.

[2]     Cited pages and exhibits from the Johnson Dep. are attached as Exhibit A hereto.

providing therapy, such as licensed professional counselors, social workers, qualified mental health care providers and psychologists. See Johnson Dep. p. 19, lines 10-22; p. 20, lines 1-16. Johnson did not believe Avery needed a license to do these things.  See August 19, 2021 Deposition of Joni J. Johnson. M.D. as Corporate Designee ("PP4AL Dep.")  p. 26, lines 11-19.[3]

3.      Around that time, Avery told Johnson that Avery possessed a "provisional license" to practice psychology.  When Johnson first learned this from Avery, Johnson "requested documentation to support that, and then numerous times after that I continued to ask." Those requests continued through 2017.  Avery repeatedly promised to provide such documentation, but never did so.  Johnson Dep. p. 54, lines 4-22; p. 55, lines 1-22.

4.      Avery's full-time status changed to part-time status in the spring of 2017. PP4AL Dep. p. 27, lines 6-12. After Spring 2017, Avery's duties as a PP4AL employee included "cognitive educational testing and autism testing", and Avery was required to continue therapy for clients of PP4AL for purposes of transitioning their care to other treaters. See Johnson Dep. Johnson Dep. p. 29, lines 2-19; p. 30, lines 7-15; p. 75, lines 3-8.

5.      Avery attended meetings relative to a diagnosis of a client or patient for PP4AL. Johnson Dep. p. 38, lines 15-22; p. 39, line 1.

6.      Johnson was not aware of whether the transition was completed or whether Avery continued to see clients and/or patients. Johnson Dep. p. 29, 20-22; p. 30, line 1; p. 34, lines 8-18; p. 35, lines 5-11.

7.      On October 10, 2017, PP4AL terminated Avery, effective September 30, 2017. Johnson Dep. p. 75, lines 4-6; and Johnson Dep. Exh. 9 attached thereto.

---

[3]      Cited pages and exhibits from the PP4AL Dep. are attached as Exhibit B hereto.

8.      PP4AL determined that notwithstanding Avery's purported "provisional license" to practice psychology, PP4AL could not bill Avery's testing services directly. See PP4AL Dep. p. 27, lines 13-21.

9.      Avery executed two Supervision And Permission To Bill Agreements ("Supervision Agreements") purporting to designate two PP4AL licensed professional counselors, Mary Byrne and Phyllis Braxton, as supervisors and Avery as a "Post Doctoral Resident". Johnson Dep., p. 67, lines 12-17; PP4AL Dep. p. 18, lines 16-18.[4]  See also September 20, 2021 Affidavit of Mary Ann Byrne ("Byrne") ("Byrne Aff.") ⁋ 1.[5]

10.     Johnson understood that in order for one of the licensed professional counselors to be able to supervise Avery as a "resident in training," "they would have to create a supervisory packet that needed to be completed and submitted to the state." However, Johnson never checked to see whether this was done.  See Johnson Dep. p. 68, lines 8-21.

11.     The Supervision Agreements that identified Avery as a "Post Doctoral Resident" also provided that they "allow[ed the] employee to be the rendering service provider" and the supervising licensed professional counselors to be the "billing providers." See Exh. C; see also Johnson Dep. p. 100, lines 6-16.

12.     Byrne signed one of the Supervision Agreements within the understanding that state approval would be required for Avery to become a Licensed Professional Counselor resident for therapy purposes but was never advised that state approval had been obtained. See Byrne Aff. ⁋ 1.

---

[4]      The Supervision Agreements are attached as Exhibit C hereto.
[5]      The Byrne Aff. Is attached as Exhibit D hereto.

13.     After Byrne signed the Supervision and Permission to Bill Agreement, she did not hear anything further from anyone regarding supervising Avery or about Avery obtaining state approval with regard to becoming a resident in training. See Byrne Aff. ¶ 2.

14.     Byrne never supervised Avery and had no knowledge that Avery was providing therapy to clients of PP4AL until September or October 2017, when she learned from Avery that she was Avery's supervisor during a court case. See Byrne Aff. ¶ 3.

15.     Although the Supervision Agreements identified Avery as a Resident Employee of PP4AL, PP4AL did not consider Avery to be employed as a resident at any time.  PP4AL Dep. p. 18, lines 11-22.

16.     In 2014 Avery advised Johnson that she was exempted from the standard Board of Psychology licensing requirements and instead had been granted a three-year provisional license to practice as a psychologist in Virginia. Johnson Dep. p. 53, lines 1-13.

17.     Thereafter, Johnson repeatedly asked for Avery's proof of licensure, but Avery never provided Johnson with proof of licensure. See September 7, 2021 Responses of Defendant Johnson to Plaintiff's First Requests for Admission ("Johnson Adm. Resp.") No. 2.[6]  Avery never provided Johnson with any documentation of any provisional license to practice as a psychologist in Virginia. See PP4AL Dep. p. 28, lines 15-17; Johnson Dep. p. 54, lines 4-19; p. 55, lines 9-12.

18.     Johnson understood that Avery's purported provisional license would expire some time in 2017. Johnson Dep. p. 59, lines 11-16.

---

[6]     Johnson Adm. Resp. is attached as Exhibit E hereto.

19.     In or around January 2017 and prior to June 2017, Johnson was advised by Avery that she would not be able to obtain permanent licensure in Virginia nor the District of Columbia. See Johnson Adm. Resp. Nos. 5, 7.

20.     A 2014 letter from the Virginia Department of Health Professions ("DHP") to Avery indicated she had been the subject of an investigation by DHP into a complaint alleging that Avery had been engaged in the "unlicensed practice of psychology (clinical psychologist)" and that the DHP had closed the matter "undetermined", subject to being "reopened" "if additional information or additional complaints were received." Johnson was aware of the contents of the DHP letter prior to 2017.  Johnson Dep. p. 52, lines 2-13.[7]

21.     In or around late March, Avery became a part-time employee with plans to limit her work for PP4AL to conducting cognitive testing.  However, Avery was not directed to cease behavioral therapy sessions with PP4AL patients, but instead was required to continue conducting therapy with all of her patients until such time as she successfully transitioned those patients to other treaters.  Dr. Johnson had no specific knowledge regarding when such transitioning was completed, but testified only that after March 2017, Avery was continuing to see patients for therapy that she was transitioning.  See Johnson Dep. p 29, lines 9-22; p. 30, lines 1, 7-15.

***Materiality of False Responses to Policy Application Questions.***

22.     MMICNC issued Medical Professional Liability Policy No. PS119567 to Johnson for the Policy Period from September 1, 2017 to September 1, 2018 (the "2017-18 Policy") and a renewal policy, Policy No. PS119567, for the Policy Period from September 1, 2018 to March 2,

---

[7]     The DHP letter, Exhibit 4 to the Johnson Dep., is included as part of Exhibit A hereto (cited portions of the Johnson Dep.).

2019 (the "2018-19 Policy"). See September 14, 2021 Affidavit of Tami Phillips ("Phillips Aff.") ¶ 2.[8]

23.     Among other provisions, each of the policies stated, at Section XII. Policy Conditions, (h) **Insured's** Representations, that "[b]y acceptance of this policy, each **Insured** agrees that the statements in the respective applications, renewal questionnaire, and any other documents submitted to the Company are true and correct.  In addition, it is understood and agreed that those statements are incorporated into and shall form a part of this policy.  The Company reserves the right to rescind this policy or any coverage provided thereby, for any material misrepresentations made by an **Insured.**"   Exhs. A & B to the Phillips Aff. (Exh. F hereto).

24.     In connection with her application for the 2017-18 Policy, Johnson submitted an Entity Professional Liability Application, signed electronically by Johnson on June 19, 2017 (the "Entity Application") and a Medical Practitioners Professional Liability Application (the "Medical Practitioners Application") signed electronically by Johnson on July 13, 2017.  Phillips Aff. ¶ 3.[9]

25.     Under the section **"General Information"** of the Entity Application asked, "Has the Applicant or any of its employees ever been the subject of disciplinary investigative proceedings or a reprimand by a governmental or administrative agency, hospital, or professional association? The answer provided by Johnson was "no." Phillips Aff. ¶ 7; see also Exh. G.

---

[8]     The Phillips Aff. is attached as Exhibit F hereto.  The 2017-18 and 2018-19 Policies are attached hereto as Exhibits A and B to the Phillips Aff.

[9]     The Entity Application and the Medical Practitioners Application, which are contained within the policies attached to the Phillips Aff., are attached separately as Exhibits G and H hereto.

26.     Based on her deposition testimony, Johnson's "no" response to the question on the June 19, 2017 Entity Application regarding whether any employee of PP4AL ever been the subject of disciplinary investigative proceedings would have been regarded by the Underwriting Department as false. Had the answer been yes, the Underwriting Department would have confirmed that Avery was in fact unlicensed and was involved in patient care as of June 19, 2017; and MMICNC would have declined to offer coverage. Phillips Aff. ₱ 10; see also Exh. G.

27.     Under the section "Non-Physician/Non-Dentist Personnel" the Entity Application required the applicant to disclose and specify all non-physician and non-dentist personnel employed by the practice and to indicate the number of such personnel employed by PP4AL. This section required the applicant to identify whether it employed certain categories of personnel. One of the categories was "psychotherapist." If an employee did not fall within the list of specific categories, the application required such employee to be "specified" in the category called, "Other." Johnson indicated that she employed "0" psychotherapists and only "2" "Others" whom she specified as licensed professional counselors. Phillips Aff. ¶¶ 11-12; see also Exh. G.

28.     Avery provided cognitive behavioral therapy to PP4AL patients as well as family therapy.   Avery also provided therapy for mental health conditions such as depression. See Johnson Dep. p. 45, lines 4-22; p. 46, lines 1-22; p. 47, lines 1-7.

29.     After Spring 2017, Avery's duties also included participating as a member of a "team" of all personnel "involved in the evaluation of [a] patient", and that a patient's diagnosis "would have been made by them". Johnson Dep. p. 37, lines 8-22; p. 38, lines 1-22; p. 39, lines 1-21.

30.     Because Avery's duties as of June 19, 2017, included cognitive testing for
conditions including autism, participation in a "team" that made medical diagnoses, and
providing patient therapy for transition purposes, Johnson's response on the Entity Application
that PP4AL employed "0" psychotherapists was false. Had the application indicated that PP4AL
in fact employed a psychotherapist, the Underwriting Department would have required that that
person submit a separate application and MMICNC would have confirmed that person's
licensure. The Underwriting Department would have confirmed that Avery was in fact
unlicensed and was involved in patient care as of June 19, 2017; and MMICNC would have
declined to offer coverage. Phillips Aff. ⁋ 16.

31.     If for any reason Johnson believed Avery was not properly classified as a
"psychotherapist", the Entity Application required that Avery be disclosed under the "Other"
category of "Non-Physician/Non-Dentist Personnel". Johnson did not make such a disclosure on
the Entity Application but instead submitted a question through her broker as to whether the
Underwriting Department required a separate application for a "Psychologist – who is part-time
and not licensed".  MMICNC's Underwriter responded to the email advising the broker that such
an application was not needed.  The Underwriter stated that no application was needed because
Underwriting assumes that applicants are not providing unlicensed medical care and thus the
identification of a psychologist employee as "not licensed" means that such person is not
involved in patient care.  Phillips Aff. ⁋ 17.

32.     At no time, either verbally or in writing, did Underwriting ever advise Johnson or
Mr. Cox to report a "provisionally licensed" psychologist as an "unlicensed" psychologist. Based
on Johnson's testimony that she "always considered" Avery to be a "psychologist with a
provisional license", Underwriting would regard the written communication sent by Johnson to

Mr. Cox and forwarded by Mr. Cox to Underwriting that PP4AL employed an "unlicensed" psychologist to be false. Had Johnson advised Underwriting that she considered the psychologist employed by PP4AL to be "provisionally licensed", Underwriting would have required that person to submit a separate application and would have confirmed that Avery was involved in patient care as an unlicensed psychologist, at which point MMICNC would have declined to offer coverage.  Phillips Aff. ⁋ 19.

33.     On March 29, 2017, Johnson received an email from March 2017 regarding her renewal application for her policy with her prior carrier, showing that after the broker asked whether Avery was licensed and explained that Avery would only be automatically covered under the Policy if she was "not required by state law or regulation to maintain a professional license, certification or registration with respect to the scope of the duties performed", Johnson immediately wrote back, "Dr. Avery is still not licensed[.]"  See Exh. B with PP4AL Dep. Exh. 5 attached thereto.

34.     Johnson understood, prior to advising MMICNC that she employed an "unlicensed" psychologist, that if she reported any of her employees as unlicensed, they would be covered under MMICNC's policy.  See PP4AL Dep. p. 47, lines 13-22; p. 48, lines 1-2.

35.     Under the section "Claims History" the Entity Application contains the question, "Do you have knowledge of any circumstances involving the rendering or failure to render professional services that could result in a claim being brought against you?" The answer provided by Johnson was "no."  Exh. G.

36.     At the time Johnson signed the policy applications in June and July 2017, she was aware of the following "circumstances involving the rendering or failure to render professional services that could result in a claim being brought" against Johnson and PP4AL: (1) Johnson's

9

failure for over two years to confirm Avery's licensure status despite repeated requests to Avery for such documentation, during which time PP4AL permitted Avery to conduct therapy, do cognitive testing, and participate in making diagnoses; (2) Johnson's awareness of a prior investigation by the Virginia DHP into a complaint accusing Avery of the unlicensed practice of clinical psychology, which such investigation having been closed "undetermined" and subject to being reopened if additional complaints were received; (3) The use of purported resident supervision agreements to bill for Avery's therapy services, notwithstanding Avery's supposed possession of a provisional license to practice psychology, within confirming whether state approval had been obtained for such residency at a time when PP4AL did not in fact consider Avery to be a resident in training; and (4) concerns regarding Avery's failure to meet performance standards. Johnson Dep. p. 46, lines 1-21; p. 54, lines 10-19; p. 55, lines 1-12; p. 58, lines 11-22; p. 59, lines 1-3; p. 52, lines 2-13.

37.     Based on Johnson's knowledge of the above facts at the same time she signed the Entity Application, Johnson's "no" response to the Entity Application's question, "Do you have knowledge of any circumstances involving the rendering or failure to render professional services that could result in a claim being brought against you?", was objectively false. Had Johnson answered "yes" to the question, Underwriting would have required an explanation or inquired as to the reasons for the response and would have declined to offer coverage. Phillips Aff. ₱ 29.

38.     In the Entity Application's section entitled, "Prior Acts Coverage Certification" Johnson certified that she had "no knowledge of any occurrence, incident or circumstance likely to result in such a claim as of this date, other than those reported on this application."  Exh. G.

39.     Based on Johnson's knowledge of the facts at the time she signed the Entity Application, Johnson's certification was objectively false; and any contrary belief by Johnson was objectively unreasonable. Had Johnson failed or been unable to make the certification, Underwriting would have required an explanation or inquired as to the reasons for same and would have declined to offer coverage. See Phillips Aff. ⁋ 31.

40.     The Medical Practitioners Application requires applicants to disclose whether they contract, supervise or employ "Residents/Fellows" or "Psychotherapists", and states in bold-faced type with regard to those employees as follows: **"The following individuals present an additional exposure to the physician/practice and are not automatically covered by our policy. They must complete a separate application for coverage."**  Exh. H.

41.     In response to the Medical Practitioners Application's question of whether Johnson contracted, supervised, or employed "Psychotherapists," Johnson answered "no".  Exh. H.

42.     In response to the Medical Practitioners Application's question of whether Johnson contracted, supervised, or employed "Residents/Fellows," Johnson answered "no". Exh. H.

43.     Because Avery's duties as of July 13, 2017 included cognitive testing for conditions including autism, participation in a "team" that made medical diagnoses, and providing patient therapy for transition purposes, Johnson's response on the Medical Practitioners Application that she employed "no" psychotherapists were objectively false. Had the application indicated that she in fact employed a psychotherapist, the Underwriting Department would have required that that person submit a separate application and Underwriting would have confirmed that person's licensure. Underwriting would have confirmed that Avery

was in fact unlicensed and was involved in patient care as of July 13, 2017, and MMICNC would have declined to offer coverage. <u>See</u> Phillips Aff. ℙ 35.

44.     Under the section "Claims History" the Medical Practitioners Application contains the question, "Do you have knowledge of any circumstances involving the rendering or failure to render professional services that could result in a claim being brought against you?" The answer provided by Johnson was "no." Exh. H.

45.     Based on Johnson's knowledge of facts recited above at the time she signed the Medical Practitioners Application, Johnson's "no" response to the Application's question, "Do you have knowledge of any circumstances involving the rendering or failure to render professional services that could result in a claim being brought against you?", was objectively false. Had Johnson answered "yes" to the question, Underwriting would have required an explanation for inquired as to the reasons for the response and would have declined to offer coverage. Phillips Aff. ℙ 37.

46.     In the Medical Practitioners Application's section entitled, "Prior Acts Coverage Certification" Johnson certified that she had "no knowledge of any occurrence, incident or circumstance likely to result in such a claim as of this date, other than those reported on this application." Exh. H.

47.     Based on Johnson's knowledge of the above facts at the time she signed the Medical Practitioners Application, Johnson's certification was objectively false; and any contrary belief by Johnson was objectively unreasonable. Had Johnson failed or been unable to make the certification, Underwriting would have required an explanation or inquired as to the reasons for same and would have declined to offer coverage. Phillips Aff. ℙ 39.

48.     The Medical Practitioner Application states: "The following individuals present an additional exposure to the physician/practice and are not automatically covered by our policy. They must complete a separate application for coverage." Among the "following individuals" listed below that statement, in addition to "psychotherapist" is "residents/fellows."  Exh. H.

49.     Avery was considered by PP4AL to be a "resident in training" for purposes of conducting behavioral therapy in 2017; and Avery's duties as a PP4AL employee as of the dates of the applications in June and July 2017 included continuing such behavioral therapy while "transitioning" her therapy clients to other providers. Had Johnson disclosed that she employed a resident, that person would have been required to provide a copy of her insurance with the school, a copy of her license and a copy of the contract between the University, Avery and PP4AL providing employment to the resident in a post-graduate training program. Underwriting would have discovered that Avery had no such license, contract or insurance and would have declined to offer coverage. Phillips Aff. ⁋ 40.

50.     If Johnson would have reported that Avery was licensed. MMICNC "would have requested and required an application and had Ms. Avery fill out her own application. We would have, presumably if she did that, received her application, and we would have confirmed whatever licensure was represented. Given, as we've discussed, that we know she was not licensed, we would have denied – excuse me – declined to quote and declined to issue either of these policies." See September 9, 2021 Deposition of Jason D. Newton as Corporate Designee ("MMICNC Dep.") p. 112, lines 17-25; p. 113, lines 1-4.[10]

## II.   STANDARDS FOR DETERMINING MATERIAL FALSITY OF ANSWERS TO INSURANCE APPLICATION QUESTIONS

---

[10] Cited pages from the MMICNC Dep. are attached as Exhibit I hereto. An exemplar application is attached as Exhibit J.

Pursuant to Va. Code § 38.2-309 (formerly § 38.1-336), "All statements, declarations and descriptions in any application for an insurance policy or for the reinstatement of an insurance policy shall be deemed representations and not warranties. No statement in an application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue."

Materiality of a false representation is "a question for the court to decide." Hawkeye-Security Ins. Co. v. Gov't Emps. Ins. Co., 207 Va. 944, 947, 154 S.E.2d 173, 175 (1967). A fact is material to the risk to be assumed by an insurance company if the fact would reasonably influence the company's decision whether or not to issue a policy. See Mutual of Omaha Ins. Co. v. Echols, 207 Va. 949, 953-54, 154 S.E.2d 169, 172 (1967).

Such material fact need not relate to a particular claim. See Fid. Bankers Life Ins. Corp. v. Wheeler, 203 Va. 434, 438, 125 S.E.2d 151, 154 (1962) ("If the knowledge of a fact would cause the insurer to reject the risk, or to accept it only at a higher premium rate, that fact is material, though it may not even remotely contribute to the contingency upon which the insurer would become liable, or in any wise affect the risk."), quoting Vance, Law of Insurance (Anderson 3rd Ed. 1951) Section 62, page 376.

"Representations in an application for a policy of insurance should not only be true but full. The insurer has the right to know the whole truth. If a true disclosure is made, it is put on guard to make its own inquiries, and determine whether or not the risk should be assumed. A misstatement of material facts by the applicant takes away its opportunity to estimate the risk under its contract. A knowledge or ignorance of such facts would naturally and reasonably influence the judgment of the insurer in making the contract or in establishing the degree of

14

character of the risk or in fixing the rate of premiums." <u>Inter-Ocean Ins. Co. v. Harkrader</u>, 193

Va. 96, 100, 101, 67 S.E.2d 894, 897 (1951).

## III.   ARGUMENT

### A.   Johnson Made Multiple False Responses on Her Policy Applications to Questions Which, Had They Been Answered Truthfully, Would Have Led MMICNC to Discover that Johnson and PP4AL Were Employing Avery as a Psychologist Engaged in Patient Care and that Avery Was Not Licensed to Do So; and MMICNC Would Not Have Issued the Policies.

Separate from her responses regarding her knowledge of circumstances that "could"

result or were "likely' to result in a claim, which will be addressed in the section immediately

following this one, Johnson provided four false answers on her entity and medical practitioner

insurance applications. SMF ¶¶ 25, 27, 35, 38, 41, 42, 44-46. Each of these false responses was

material to MMICNC's decision to issue the Policy because as to each question independently,

had Johnson answered truthfully, MMICNC would not have issued either of the Policies. SMF

¶¶ 26, 30, 32, 36-37, 43, 47, 50.

Specifically, as set forth below, Johnson provided false answers to four questions on her

policy applications, which answers disguised the fact that Avery was providing patient care as a

"psychotherapist" and as a "resident in training", that Avery had been the subject of a

Department of Health Professions investigation into the unlicensed practice of psychology, and

that Avery had been conducting cognitive testing of and providing cognitive behavioral therapy

for PP4AL patients under a purported "provisional license", as to which she had failed for two

years to provide proof despite Johnson's repeated requests. <u>See id.</u> Each of these four questions

had the effect of concealing from MMICNC, and of preventing MMICNC from discovering, that

PP4AL and Johnson employed Avery to provide patient care without the necessary license to do

so. <u>See id.</u>

In addition, separate from her policy applications, Johnson submitted through her broker a list of employees as to whom she asked if separate applications were needed, which list included a "psychologist - part time - unlicensed". SMF ⁋ 31, see also PP4AL Exh. 5 attached thereto to Exh B. Johnson testified at deposition that she believed at the time that the psychologist, i.e., Avery, was "provisionally" licensed, but that her broker told her to tell MMICNC that the psychologist was unlicensed. SMF ⁋ 32, see also Exh. A.  Johnson understood that if she did so, the unlicensed psychologist would be covered under the policy. See id. Based on her understanding and belief, the statement that she employed an "unlicensed" psychologist was materially false. SMF ⁋ 32.  Had she identified Avery as licensed, provisionally or otherwise, MMICNC would have required Avery to submit a separate application, would have discovered Avery was engaged in patient care and was not licensed to do so, and would have declined to issue the policies. See id.

       1.     **Johnson Falsely and Materially Stated in the Applications That PP4AL Did Not Employ a "Psychotherapist".**

Johnson's Medical Practitioner Application contained the following notice, in bold-face type, regarding the requirement to disclose whether she employed certain "non-medical personnel":

> **"The following individuals present an additional exposure to the physician/practice and are not automatically covered by our policy. They must complete a separate application for coverage."** SMF ⁋ 40.

Among the "following individuals" listed below that warning is "psychotherapist".  See id. Johnson's individual application and PP4AL's separate policy application each asked that the applicant state the number of psychotherapists the applicant employed. See Exhs. G & H. Johnson answered in each case that she employed no psychotherapists. SMF ⁋ 27, 41.  In fact, she employed Avery to provide cognitive behavioral therapy to PP4AL patients, which therapy is

a hallmark of the practice of psychotherapy, and which therapy Avery had been directed to continue to provide for "transition" purposes at the time the applications were signed.  (Avery had switched to part-time status three months earlier and was planning to phase out her therapy work, but was required to continue therapy for transition purposes.) SMF ¶¶ 2, 4, 21.

Specifically, starting in late 2014, Avery's duties expanded to conducting cognitive behavioral therapy, which by a multitude of definitions is a common form of psychotherapy.[11] She continued such therapy at the time when applications were signed, during which her responsibilities included transition therapy, i.e., continuing conducting behavioral therapy with her patients while preparing them for transition to a new therapist. SMF ¶¶ 4, 21.

Avery also engaged in family therapy, which is "is a type of psychological counseling (psychotherapy) that can help family members improve communication and resolve conflicts." (Mayo Clinic Web Site Article, "Family Therapy"),[12]  See also The Free Dictionary's Medical

---

[11]    See Suess v. Berryhill, No. 16 CV 50260, 2017 U.S. Dist. LEXIS 152754, at *16 n.4 (N.D. Ill. Sep. 20, 2017) ("'A form of psychotherapy [is] called cognitive behavioral therapy  . . .'") (quoting "Mayo Clinic Website"); C.P.X. v. Garcia, 450 F. Supp. 3d 854, 873 (S.D. Iowa 2020) (referring to "cognitive behavioral therapy" as one of the "specific forms of psychotherapy"); In re Autumn F., Nos. K09CP09011833A, K09CP09011834A, K09CP09011835A, 2013 Conn. Super. LEXIS 947, at *33 (Super. Ct. Apr. 23, 2013) ("The two main types of treatment are psychotherapy, sometimes called 'counseling,' and medication. Cognitive Behavioral Therapy . . . make up the 'best evidence' psychotherapy options.") (finding of fact); Sides v. Beard, No. : 1:CV-04-1349, 2006 U.S. Dist. LEXIS 87035, at *6 (M.D. Pa. Dec. 1, 2006) ("Hume stated that psychotherapy, specifically cognitive behavioral therapy, is helpful for a bipolar disorder patient, helping the patient to correct misperceptions about himself and his environment."); Marion v. Saul, No. 19-CV-76-LRR, 2020 U.S. Dist. LEXIS 84832, at *21 n.11 (N.D. Iowa Apr. 21, 2020) ("'Cognitive behavioral therapy (CBT) is a common type of talk therapy (psychotherapy). [Patients] work with a mental health counselor (psychotherapist or therapist) in a structured way, attending a limited number of sessions. CBT helps [patients] become aware of inaccurate or negative thinking so [they] can view challenging situations more clearly and respond to them in a more effective way.'"), quoting Mayo Clinic, Cognitive behavioral therapy, Overview, https://www.mayoclinic.org/tests-procedures/cognitive-behavioral-therapy/about/pac-20384610.
[12]    Available at https://www.mayoclinic.org/tests-procedures/family-therapy/ about/ pac-20385237#:~:text=Family%20therapy%20is%20a%20type% 20of%20psychological%

Dictionary, https://medical-dictionary. thefreedictionary.com/family+therapy (last visited Sept. 14, 2021) ("Family therapy is a form of psychotherapy that involves all the members of a nuclear or extended family.").

It did not matter, for purposes of determining whether Johnson and PP4AL employed a psychotherapist, that it later became known that Avery lacked a licensed to practice psychology, because PP4AL did not rely on Avery's purported "provisional" license to practice psychology. SMF ⁋ 3. Instead, Avery was billed not as a clinical psychologist but as a "resident in training" accumulating hours toward future licensure as a Licensed Professional Counselor ("LPC").  SMF ⁋⁋ 8-12, 15.

What was relevant, for purposes of the insurance applications, was that the type of therapy Avery was providing as a resident constituted psychotherapy, which is in fact one of the requirements of an LPC residency.  Under the regulations in effect in 2017, a supervised resident was required to utilize "psychotherapy techniques" as part of the residency requirement for a licensed professional counselor. See 18VAC115-20-52 (B)(1)(a). (Revised July 3, 2014).

"Psychotherapist is a general term, rather than a job title or indication of education, training or licensure. Examples of psychotherapists include psychiatrists, psychologists, licensed professional counselors, licensed social workers, licensed marriage and family therapists, psychiatric nurses, or other licensed professionals with mental health training."  See Mayo Clinic Website.[13]  The hat Avery wore while conducting psychotherapy did not determine whether what she was doing constituted psychotherapy.

---

20counseling,a%20psychologist%2C%20clinical%20social%20worker%20or%20licensed%20therapist. (Last visited September 14, 2021

[13]     Available at https://www.mayoclinic.org /tests-procedures/cognitive-behavioral-therapy/about/pac-20384610 (last visited Oct. 15, 2021).

As such, Avery's responses in her applications that PP4AL employed "0" psychotherapists were materially false. SMF ⁋ 30, 43. Had the applications indicated that PP4AL in fact employed a psychotherapist, MMICNC would have required that that person submit a separate application and would have confirmed that person's licensure. See id.  Underwriting would have confirmed that Avery was in fact unlicensed and was involved in patient care as of June 19, 2017; and MMICNC would have declined to offer coverage. See id.

### 2.  Johnson Falsely and Materially Stated on her Medical Professional Application That PP4AL Did Not Employ a "Resident".

At her depositions both individually and as corporate designee of PP4AL, Johnson disclosed for the first time that while Avery had been conducting cognitive behavioral therapy for over two years, she had done so not as a psychologist but as a "resident in training", i.e., as a resident under supervision pursuant to the regulations governing the qualifications necessary to become a licensed professional counselor. SMF ⁋⁋ 9-11.  Such residents, in addition to other duties, are required to provide "psychotherapy".[14]

The list in Johnson's Medical Professional Application of "individuals [who] present an additional exposure to the physician/practice" and thus "must complete a separate application for coverage" included "residents/fellows. Johnson answered that she employed no residents. SMF ⁋⁋ 48-49. She had, however, been billing patients' insurers for Avery's therapy services as a "resident" under the supervision of PP4AL's two licensed professional counselors, pursuant to a

---

[14]     A supervised resident is required to utilize "psychotherapy techniques" as part of the residency requirement for a licensed professional counselor.  18VAC115-20-52 (B)(1)(a). (Revised July 3, 2014).

"Supervision and Permission to Bill Agreement" that identified Avery as a "Post Doctoral Resident" and that "allow[ed the] employee to be the rendering service provider" and the supervising licensed professional counselors to be the "billing providers". SMF ¶¶ 9-15.

According to Johnson's deposition testimony, any time Avery conducted cognitive behavioral therapy with PP4AL patients, she did so as a resident. SMF ¶ 9. Again, notwithstanding the planned phasing out of Avery as a therapist after she became a part-time employee in or around March 2017, she was still directed to conduct transition therapy thereafter. SMF ¶¶ 4, 21.

Johnson's answer in her application that she employed "0" residents was materially false. SMF ¶ 42, 48-49. Had Dr. Johnson disclosed that she employed a resident, that person would have been required to provide a copy of her insurance with the school, a copy of her license, and a copy of the contract between the university, Avery and PP4AL providing employment to the resident in a post-graduate training program. See id. Underwriting would have discovered that Avery had no such license, contract or insurance and would have declined to offer coverage. See id.

> **3.      Johnson's Answer in the Entity Application that No Employee of PP4AL Had Ever Been the Subject of Disciplinary Investigative Proceedings was Materially False.  Avery Had Been the Subject of Such Proceedings.  Had Johnson Answered "Yes" to the Question, MMICNC Would have Discovered that Avery was Engaged in Patient Care Without a Required License and Would Not Have Issued the Policy.**

PP4AL's June 19, 2017 policy application, under the "General Information" section, asked "[h]as the applicant **or any of its employees** ever been the subject of disciplinary investigative proceedings or a reprimand by a governmental or administrative agency, hospital, or professional association?"  Johnson answered "no". SMF ¶ 25.

To the contrary, Avery, a present employee, had been the subject of an investigation by the Virginia Department of Health Professions, a governmental agency which conducts disciplinary proceedings, in 2014.  Johnson was aware of the investigation and that it had been closed "undetermined" and subject to being reopened if additional complaints were received. SMF ¶¶ 20, 36.

Based on the foregoing, Dr. Johnson's "no" response to the question on the June 19, 2017 Entity Application regarding whether any employee of PP4AL ever been the subject of disciplinary investigative proceedings was false and material to the insurer's decision to issue the Policies.  See id. Had the answer been yes, Underwriting would have confirmed that Avery was in fact unlicensed and was involved in patient care as of June 19, 2017; and MMICNC would have declined to offer coverage.  SMF ¶ 45.

> **4.  Assuming *Arguendo* That Avery was Not a "Psychotherapist" or a "Resident", the Policies Required that Avery Be Disclosed and Identified Among "Other" Non-Medical Personnel.  While Johnson Reported that She Employed Licensed Professional Counselors Among Such "Other" Employees, She Omitted Listing Avery Notwithstanding Her Belief that Avery Was "Provisionally" Licensed and Notwithstanding that Avery Was Employed as a "Resident", "Because [Her Broker Thomas] Cox Instructed Me That She Should Not Be On [the] Application."  Johnson's Omission Rendered Her Answer in the Entity Application that she employed only "2" "Other" Non-Physician personnel Was Materially False.**

If for any reason Johnson believed Avery was not properly classified as a "psychotherapist" or a "resident", both the Entity Application and the Medical Professional Application required that Avery be disclosed under the "Other" category of "Non-Physician/Non-Dentist Personnel"; and the Entity Application required that such "Other" Personnel be "specif[ied]".  See Exh. F hereto.  Dr. Johnson did not make any such a disclosure on either application, nor did she specific any "other" employees apart from "Licensed

Professional Counselors".  See id. Johnson testified that she did not disclose Avery as an "Other" employee "because [her broker Thomas] Cox instructed me that she should not be on the application."  See Exh. B; SMF ⁋ 31.

Assuming *arguendo* that Mr. Cox told her any such thing, and regardless of whether Mr. Cox could be considered to be acting on MMICNC's behalf instead of (as is correct) Johnson's, as a matter of law, where Johnson understood that Avery was in fact an employee, any instruction to omit Avery from the application would not excuse her from her obligation to provide truthful responses.  See e.g., De Ford v. Nat'l Life & Acci. Ins. Co., 182 Tenn. 255, 262, 185 S.W.2d 617, 620 (1945) ("The rule which imputes an agent's knowledge to the principal does not apply when the third party was acquainted with the circumstances plainly indicating that the agent would not advise his principal."), quoting Mut. Life Ins. Co. v. Hilton-Green, 241 U.S. 613, 623 (1916).

Johnson's answer in the Entity Application that she employed only "2" "other" Non-Physician personnel was materially false. SMF ⁋ 31.  If Johnson had instead specified Avery as an "Other" employee and specified that Avery was "provisionally licensed", as she testified she believed to be true, MMICNC's underwriter would have required that person to submit an application and would have confirmed that the applicant was involved in patient care as an unlicensed psychologist and would have declined to offer coverage. SMF ⁋ 32.

> ### 5.      Johnson, Through Her Broker, Emailed the Underwriter that She Employed a "Psychologist - Part Time - Unlicensed" Without Disclosing that (a) the Psychologist was Engaged in Patient Care" and (b) to Johnson's Knowledge and Belief, the Psychologist was in Fact Not "Unlicensed" but was "Provisionally Licensed".

The Policies stated, at Section XII. Policy Conditions, (h) **Insured's** Representations, that "[b]y acceptance of this policy, each **Insured** agrees that the statements in the respective

applications, renewal questionnaire, **and any other documents submitted to the Company** are true and correct.  In addition, it is understood and agreed that those statements are incorporated into and shall form a part of this policy.  The Company reserves the right to rescind this policy or any coverage provided thereby, for any material misrepresentations made by an **Insured.**" (Italicized emphasis added.) SMF ⁋ 23.

Separate from her application, Johnson, through her broker, sent an email asking MMICNC's Underwriter, Tami Phillips, whether Johnson needed to submit a separate application for an employee described as a "psychologist - part-time - unlicensed".  SMF ⁋ 31.

Johnson testified that she in fact believed Avery was a "provisionally" licensed psychologist, but that her broker told her instead that the employee should be disclosed to the Underwriter only as unlicensed, which the Underwriter understood to mean the person was not engaged in patient care or other work requiring a license.[15] SMF ⁋ 32, <u>see also</u> Exh. A.

Johnson understood, prior to advising MMICNC that she employed an "unlicensed" psychologist, that if she reported any of her employees as unlicensed, they would be covered under MMICNC's policy. SMF ⁋ 34.

> Q    Did you -- or did PP4AL receive any information from Mr. Cox about whether Ms. Avery would still be covered by this policy?
>
> A    **According to the e-mail I received, which I think was shown as an exhibit earlier, I was  given the impression -- because I don't -- I have to use those terms because I don't remember the  exact wording of the e-mail, but she fell into the category, much like some of my other employees who were not licensed and yet would still be covered under the policy but need not be named specifically.[16]**

---

[15]    The Virginia Board of Psychology licenses three categories of psychologists: applied psychologists, clinical psychologists, and school psychologists.  <u>See</u> Va. Code § 54.1-3606 ("In order to engage in the practice of applied psychology, school psychology, or clinical psychology, it shall be necessary to hold a license.").

[16]    The email Johnson referred to was in fact an email from March 2017 regarding her renewal application for her policy with her prior carrier, showing that after the broker asked whether Avery was licensed and explained that Avery would only be automatically covered

If Johnson had instead disclosed, as she testified she believed to be true, that she employed a "provisionally" licensed psychologist, MMICNC's underwriter would have required that person to submit an application and would have confirmed that the applicant was involved in patient care as an unlicensed psychologist and would have declined to offer coverage. SMF ⁋ 32.

B.     **Based on the Facts Known to Johnson When She Signed the Policy Applications, Her Responses that She Had No Knowledge of Any Circumstances Involving the Rendering or Failure to Render Professional Services that Could Result in a Claim and Her Certifications that She Had No Knowledge of any Occurrence, Incident or Circumstance Likely to Result in a Claim, Were Objectively False and Material to the Risk.**

Johnson's Medical Professional and Entity Applications each contained a certification for purposes of "prior acts coverage" that the applicant has no knowledge of any "occurrence, incident or circumstance likely to result" in a professional liability claim.  The applications also each required an answer to a "claims history" question asking whether the applicant has "knowledge of any circumstances involving the rendering or failure to render professional services that could result in a claim being brought against you". SMF ⁋⁋ 35, 44, 46.  Finally, each application includes an "authorization and release" section where the applicant by signature "certify[ies] the representations in this application to be true and understand that the policy if issued, is conditioned upon the truth of the representations in this application. I further understand that the falsity of any representations made in this application for insurance could

---

under the Policy if she was "not required by state law or regulation to maintain a professional license, certification or registration with respect to the scope of the duties performed", Johnson immediately wrote back, "Dr. Avery is still not licensed[.]"  See PP4AL Dep. Exh. 5, which is part of Exhibit B to this Memorandum.

cause the denial of a claim or the cancellation of my protection if coverage is written as a result of this application." See Exhs. G & H.

By her signature and responses, Johnson certified that she had no knowledge of any occurrence, incident or circumstance likely to result in a professional liability claim, that she did not know of any circumstances involving the rendering or failure to render professional services that could result in a claim being brought against her or PP4AL, and that she understood that the policy was conditioned upon the truth of the representations in the applications and that any false representation in the applications could cause the denial of a claim. See id.

Finally, Section XII of the Policy conditions the Policy's validity on the truth of the statements made by Johnson when she applied for the Policy:

> By acceptance of this policy, each Insured agrees that the statements in the respective applications, renewal questionnaires, and any other documents submitted to the Company are true and correct. In addition, it is understood and agreed that those statements are incorporated into and shall form a part of this policy. The Company reserves the right to rescind this policy or any coverage provided hereby, for any material misrepresentations made by an insured. See Exhs. A & B attached to Ex. F hereto.

In addition to the false statements and responses set forth above with regard to the factual questions contained in the Policies, her "Claims History" certification that she had no knowledge of any circumstances involving the rendering or failure to render professional services that could result in a claim being brought against her or PP4AL, and her certification that she had no knowledge of any occurrence, incident or circumstance likely to result in a professional liability claim, were materially false. SMF ¶¶ 35, 39, 44-45.

When she signed her applications in June and July 2017, the facts known to Johnson regarding Avery's licensure and residency status would lead any reasonable practitioner to

conclude that a professional liability claim could be brought against her and PP4AL, and that in fact made the subsequent claims against Johnson and PP4AL eminently predictable.

"Virginia courts have assessed an insured's prior knowledge under an objective standard, asking whether a reasonable person in possession of the facts known to the insured, would have had a reasonable basis to know that a claim might be made."  Cont'l Cas. Co. v. Graham & Schewe, 339 F. Supp. 2d 723, 727 (E.D. Va. 2004)

Regarding Avery's license, Johnson knew (a) Avery had been investigated for practicing psychology without a license and that the investigation had been closed "undetermined", subject to being reopened if further complaints were received; (b) Avery had only claimed to possess a three year "provisional" license that was supposedly expiring sometime in 2017; (c) despite understanding that Avery's "provisional" license was about to expire, Johnson allowed her to continue to conduct therapy without bothering to find out about an expiration date; (d) Avery had told Johnson that Avery was probably not going to be able to obtain permanent licensure; (e) Johnson had been suspicious enough about Avery's supposed "provisional license" that she asked Avery over a period of more than two years to produce evidence of such license, never received such evidence, and yet allowed Avery to continue conducting cognitive testing and cognitive behavioral therapy with PP4AL patients; (f) Johnson asked colleagues outside PP4AL if they had ever heard of a "provisional" license to practice psychology and they told her they had not; and (g) Johnson allowed Avery to conduct therapy as a supposed "resident in training" because of concerns regarding whether Avery's "provisional" license authorized her to conduct therapy, but despite knowing that such a residency program required state approval, never bothered to confirm whether such approval had been obtained, and instead utilized "Supervision and Permission to Bill" agreements identifying Avery as a resident employee of PP4AL when in

fact Johnson understood that Avery was never actually employed at PP4AL as a resident. <u>See</u> Exh. A & B and SMF ❡ 36.

On top of all that, Johnson knew Avery was not meeting performance standards in her treatment of PP4AL patients, include missing and rescheduling appointments, and that Johnson had received at least one complaint of Avery falling asleep during a therapy session. <u>See</u> Exh. A., p. 77.

Taken together, such facts as set forth above make clear that the allegations contained in the lawsuits Johnson now faces for negligent failure to confirm Avery's qualifications and licensure status and her negligent retention eminently foreseeable in 2017, and demonstrate that Johnson's answers and certifications as to whether such claims "could" or were "likely" to result, were clearly false.

The claims asserted in the state court actions allege, for example, negligent hiring and retention.   A reasonable practitioner would know that Dr. Johnson's failure to take minimal steps to confirm Avery's licensure, particularly in light of the multiple red flags known to Johnson indicating the probability that Avery was in fact unlicensed, made a future claim, such as one for negligent hiring, likely.  <u>See</u> <u>A.H. v. Church of God in Christ, Inc.</u>, 297 Va. 604, 627, 831 S.E.2d 460, 473 (2019) ("Liability for negligent hiring 'is based on the principle that one who conducts an activity through employees is subject to liability for harm resulting from the employer's conduct if the employer is negligent in the hiring of an improper person in work involving an unreasonable risk of harm to others".) (quoting <u>Se. Apartments Mgmt., Inc. v. Jackman</u>, 257 Va. 256, 260, 513 S.E.2d 395, 397 (1999)).[17]

---

[17]     This would be all the more true given the relative ease of confirming licensure.  The Department of Health Professions' online "Licensure Lookup", which is contained on DHP's official web site and which "serves as primary source verification of the credential issued by the

Similarly, a reasonable practitioner would know that Dr. Johnson's continued retention of Avery after Avery had ignored repeated requests to verify her licensure and under the other circumstances set forth above meant that a future claim for negligent retention could result or was likely to do so, given the requirements for such a claim.  See Courtney v. Ross Stores, Inc., 45 Va. Cir. 429, 431 (Cir. Ct. 1998) (A claim for negligent retention requires that an employer "negligently retain or fail to fire or remove an employee after learning of the employee's incompetence, negligence, or unfitness for a position"), citing Big Stone Gap Iron Co. v. Ketron, 102 Va. 23, 27, 45 S.E. 740, 741 (1903).

A reasonable practitioner would not have to know whether a specific "Medical Incident" had occurred as of June and July 2017 in order to conclude that claims such as the ones Johnson now faces were likely.[18]  Nor was Johnson required to know of any threatened claim against her or PP4AL -- her knowledge of questionably illegal conduct on the part of Avery was sufficient to cause a reasonable practitioner to know a claim was likely or possible.  See Esoldi v. Esoldi, 930 F. Supp. 1015, 1019-21 (D.N.J. 1996) (The insured's mere knowledge of the questionably illegal or unethical business conduct of several of the insured's partners was sufficient to place the

---

Commonwealth of Virginia", allows users to search by occupation, name, state, zip, status, or any combination of these search criteria".  See  https://dhp.virginiainteractive.org/ Lookup/Index (last visited Oct. 14, 2021).  Entering Dr. Johnson's name and field ("Medicine") produces immediate confirmation of her license, for example.

[18]   See First Prof'ls Ins. Co. v. Sutton, Civil Action No. 2:12-194-RMG, 2015 U.S. Dist. LEXIS 183505, at *15-16 (D.S.C. Oct. 7, 2015) (rejecting argument that "unless the applicant had sufficient facts to document at the time the application was completed the specific 'act, error or omission' that would give rise to the claim, the applicant had no duty to respond affirmatively to any question on the application about potential claims or suits") ("Such an interpretation would dramatically narrow the applicant's duty to provide the information requested on the application [which] seeks information about an attorney's request for medical records in which the 'facts, reasonable inferences and circumstances' indicated that a claim or suit 'might' be brought * * * There is no requirement that the applicant be aware of any specific act or omission that would give rise to a potential claim.").

insured on notice of potential claims against them, and to obligate the insured to answer the question in the affirmative, notwithstanding the lack of any manifested intent of any third parties to file a claim against the insured.).

Had Johnson answered "yes" to the application questions as to whether the applicant had "knowledge of any circumstances involving the rendering or failure to render professional services that could result in a claim being brought against you", MMICNC would have required an explanation as to the answer and would have declined to offer coverage. SMF ¶¶ 37, 45. Similarly, had Johnson failed or been unable to make the certifications described above, MMICNC would have required an explanation as to the reasons for being unable to do so and would have declined to offer coverage. SMF ¶¶ 39, 47.

## IV.    CONCLUSION

For the reasons and upon the authority set forth above, Plaintiff Medical Mutual Insurance Company of North Carolina respectfully requests that its Motion for Summary Judgment as to Count I of the Second Amended Complaint be granted and that the Court declare that Plaintiff owes no duties of defense or indemnity to the insured defendants herein.

Date: October 15, 2021                                 Respectfully submitted,

                                                      MEDICAL MUTUAL INSURANCE
                                                      COMPANY OF NORTH CAROLINA

                                                      By Counsel

                                                      /s/ Danny M. Howell
                                                      Danny M. Howell (VSB No. 30352)
                                                      danny@dmhowelllaw.com
                                                      Robert Jackson Martin, IV (VSB No. 80655)
                                                      jackson@dmhowelllaw.com

Jennifer L. Rowlett (VSB No. 81373)
jennifer@dmhowelllaw.com
Law Offices of Danny M. Howell, PLLC
6861 Elm Street, Suite 3D
McLean, VA 22101
Phone: (703) 556-8900
Fax: (703) 237-1224

*Counsel for Medical Mutual Insurance
Company of North Carolina*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, October 15, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a true and correct copy of the same to all Counsel of Record.

/s/ Danny M. Howell
Danny M. Howell

30